DAVID J. GHERITY,

       Petitioner,

v.

LORI SWENSON, Hennepin County
Probation, and MICHAEL HATCH,
Minnesota Attorney General,

       Respondents.

Civil No. 04-102 (JMR/JSM)

**REPORT AND RECOMMENDATION**

      David J. Gherity, 12600 Parkwood Drive, # 206, Burnsville, Minnesota, 55337, Petitioner, pro se.

      Patrick A. Marzitelli, Esq., Minneapolis City Attorney's Office, 333 South Seventh Street, Minneapolis, Minnesota, 55402, for Respondents.

JANIE S. MAYERON, United States Magistrate Judge

      This matter is before the undersigned Magistrate Judge of the District Court on the petition of David J. Gherity for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The case has been referred to this Court for a Report and Recommendation under 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court will recommend that Petitioner's habeas corpus petition be DENIED, and that this action be DISMISSED WITH PREJUDICE.

## I.    BACKGROUND

      On or about December 19, 2000, a criminal complaint was filed against Petitioner in the state district court for Hennepin County, Minnesota. The complaint charged Petitioner with interfering with an emergency call, four counts of fifth degree assault and

disorderly conduct.[1]

The criminal charges against Petitioner were based on an incident that allegedly occurred shortly after midnight on October 29, 2000. According to the criminal complaint, a police officer named "Vah" responded to a report of an altercation in a hallway on the 26th floor of an apartment building located in the City of Minneapolis, Minnesota. Officer Vah went to the apartment building and found two witnesses to the alleged altercation – Ronald Lee Kilgore and Daryl Wesley Palmquist. Kilgore and Palmquist told Officer Vah that Petitioner and a woman had been arguing in a common hallway outside of Apartment 2603. Kilgore said that he had stepped into the hallway and asked what was happening. According to the criminal complaint, Petitioner approached Kilgore and repeatedly punched him with a closed fist. Petitioner also allegedly grabbed Kilgore's neck and choked him. Kilgore allegedly suffered minor injuries as a result of being punched and choked by Petitioner.

It was further alleged in the criminal complaint that Palmquist attempted to call 911, and while he was doing so, Petitioner grabbed the telephone and threw it to the ground, causing it to break. Petitioner also allegedly knocked Palmquist to the ground. Both Petitioner and the woman left the scene before Officer Vah arrived.

Petitioner filed a motion asking the trial court to dismiss the criminal complaint filed against him. The trial court dismissed one of the four assault charges, but a jury trial was scheduled to proceed on the five remaining counts.

---

[1]     A copy of the criminal complaint is included in the current record as an attachment to the "Appellant's Brief and Appendix," which is part of Petitioner's "Exhibit A" in support of his current habeas corpus petition.  [Docket No. 3.]

On June 12, 2001, the day when Petitioner's jury trial was scheduled to begin, the prosecutor asked the court for permission to add another prosecution witness to the list of witnesses that had previously been given to Petitioner and his attorney. The proposed new witness, Laura Kallestad, was the woman who was in the hallway with Petitioner when he allegedly assaulted Kilgore and Palmquist.

Petitioner's counsel opposed the prosecutor's request to add Kallestad to the witness list and allow her to testify at Petitioner's trial. <u>See</u> Pretrial Transcript ("Pretrial-Tr.") [Docket No. 7]. Petitioner's attorney claimed that "the addition of this one witness significantly alters the defense'[s] strategy." Pretrial-Tr., p. 10. Counsel argued that Kallestad was "an extremely critical witness," (<u>id</u>., p. 9), and that he would have to do a great deal of work to prepare a defense to Kallestad's testimony. <u>Id</u>., pp. 9-12. However, Petitioner's attorney acknowledged that he and Petitioner knew that Kallestad was the woman who was with Petitioner at the time of the alleged assault, and thus, counsel conceded, it was "no surprise" that Kallestad was a potential witness. <u>Id</u>., p. 12. Furthermore, based on the attorney's arguments, it appeared to the trial court that the defense was already well-prepared for Kallestad's appearance at trial, and that the attorney should not need "this massive preparation in order to rebut her testimony." <u>Id</u>., p. 13.

The trial court ultimately determined that Kallestad would be allowed to testify at Petitioner's trial, and Petitioner's counsel then asked for a one-week continuance. Pretrial-Tr. pp. 20, 23. The trial court denied the request for a continuance, noting that (a) Kallestad's testimony was likely to be brief, (b) it appeared that Petitioner's counsel was already quite knowledgeable about Kallestad, and (c) Kallestad probably would not

testify for another two days, so counsel would still have some time to prepare for her appearance.  Id., pp. 21, 26-27.

During the course of the hearing on whether Kallestad should be allowed to testify, and whether a continuance should be granted, Petitioner's attorney indicated that if Kallestad was allowed to testify, he intended to challenge her credibility and character by every available means.  Upon hearing the attorney's arguments, the trial court judge became concerned that he intended to attack Kallestad's testimony by means that would not be permissible under the Minnesota Rules of Evidence. Consequently, the judge ordered Petitioner's counsel to file a memorandum setting forth the legal authority that purportedly would allow Petitioner to attack Kallestad in the manner that counsel was proposing.  The judge stated:

> Now, with regard to the issue of calling character witnesses as to the truthfulness or character of Laura Kallestad, who is a witness, not a victim, or a defendant, not a party to the case, but an eye witness, I request a written memorandum setting forth any authority for that.  And I'd like to see that by Thursday morning, and failure to submit a memorandum stating any authority for that proposition will – I will assume constitute a waiver of the issue.

Id., pp. 26-27.

Petitioner's counsel filed a memorandum as directed by the trial court.  The memorandum identified several forms of evidence that Petitioner intended to introduce at trial, including (a) evidence showing the history of the relationship between Petitioner and Kallestad, (b) evidence showing Kallestad's bias against Petitioner, (c) evidence showing Kallestad's history of alcohol abuse, and her intoxication on the night of the alleged crime, and (d) evidence showing Kallestad's "character for untruthfulness."  See Petitioner's Exhibit A (Petitioner's Memorandum to the trial court, attached to the

Appellant's Brief and Appendix) [Docket No. 3].

After reviewing the memorandum submitted by Petitioner's counsel, the trial judge gave the attorneys what she described as a "road map" for presenting evidence at trial. Trial Transcript ("Tr.")[2] p. 13. The trial court made it clear that it was not making any final rulings on the admissibility of evidence, and that its preliminary observations were "of course, subject to the changing status of the case." <u>Id</u>. The court then proceeded to outline, in general terms, what type of evidence would be admissible, and what type of evidence would be inadmissible. The trial court said that "[i]nquiry may be made under Rule 608(a) [of the Minnesota Rules of Evidence] as to Ms. Kallestad's reputation for truthfulness," and this could be accomplished by presenting "extrinsic evidence, including other witnesses who testify to her reputation for truthfulness in the community." <u>Id</u>. The court further opined that "[b]ecause Ms. Kallestad is neither a victim nor a perpetrator in this case, her character is not strictly at issue," and thus any character evidence pertaining to Kallestad would be admissible only if it would "clearly indicate fabrication or lack of truthfulness." <u>Id</u>., p. 14.

The trial court also noted that because Kallestad was merely a witness, and not a victim, "[a]s of this time, evidence of the details of the prior relationship of Kallestad and [Petitioner] is not relevant." Tr. p. 15. At the same time, however, the trial court acknowledged that evidence of "any resulting bad feelings" attributable to the past relationship between Kallestad and Petitioner would be admissible, "as it goes to bias." <u>Id</u>., pp. 15-16. The trial court also explained that evidence of Kallestad's "consumption of drugs or alcohol on the night in question is admissible," because it could reflect on

her "ability to know, remember and relate facts." Id., p. 16. But evidence of Kallestad's treatment for past alcohol or drug abuse would not be admissible "without further indication that it affects her truthfulness." Id.

The trial court indicated that evidence of Kallestad's prior legal actions against Petitioner would be admissible to show bias, and that Kallestad could be questioned about her alleged attempts to extort money from Petitioner, although "extrinsic evidence" on that subject would not be admissible. Tr. p. 16. The trial court also said that evidence pertaining to events that occurred immediately before the alleged offense would generally be admissible, but hearsay evidence would not be admissible. Id.

The "road map" provided by the trial court included several other guidelines pertaining to the types of evidence that probably would be, or would not be, admissible at trial. Tr. pp. 16-18. The trial court reiterated that no final rulings were being made, and that the ultimate resolution of all evidentiary issues would depend on how the trial unfolded. When Petitioner's attorney questioned the propriety of the evidentiary guidelines provided by the trial court, the court explained its actions as follows:

> It should be noted that the reason for my request for the defense brief came out of the fact that in arguing the motion for continuance, the defense mentioned a large volume of evidence as to Ms. Kallestad's psychosis, mental health treatment, alcoholism, rape, and other types of character evidence. This Court was concerned that this case, which charges [Petitioner] with assaults against Mr. Kilgore and Mr. Palmquist, would lose its focus and turn into a battle between [Petitioner] and Mr. Kallestad [sic] over a relationship which apparently has gone sour. That would be an inappropriate way for this case to proceed. It would also be inappropriate to put Ms. Kallestad's character, other than her character for truthfulness, into issue in this case.

---

[2] The trial transcript has been filed in this case at Docket Nos. 8-11.

> Therefore, the Court had discussion with [Petitioner's counsel] about the Court's confusion as to how any of this evidence would come in. It was clear that, [Petitioner's counsel]... had a different reading of the rules [of evidence] than mine, and therefore, I asked for an offer of proof with regard to how you intended to introduce all of this evidence which you had already voir dired upon, and which I had a great deal of question as to how and under what theory it would be admissible. Because of this and in the interest of keeping this case focused on the issues in the case, I have attempted to exert some – to clarify my reading of the rules and my potential rulings. I have indicated that those rulings would change if it was necessary.

Tr. pp. 20-21.

Shortly after the trial court provided this explanation, Petitioner's jury trial began. The first witness for the prosecution was the victim, Ronald Kilgore. He testified that shortly after he went to bed on the night of Saturday, October 28, 2000, he was awakened by a noise in the hallway outside of his apartment, which sounded like two people fighting. He heard a neighbor from a nearby apartment, Laura Kallestad, yelling for help. Tr. p. 49. When Kilgore stepped outside of his apartment to see what was happening, he saw Kallestad lying on the hallway floor, and Petitioner standing over her. Kallestad was kicking, and yelling, and Kilgore found the situation to be "very, very frightening." Id., p. 50. According to Kilgore, Petitioner appeared to be "very angry," and "inebriated." Id., p. 51.

Kilgore testified that he asked what was going on, and Petitioner then rushed toward him and grabbed his throat. Kilgore said that Petitioner choked him, punched him repeatedly in the head and shoulder, and pushed him toward a nearby balcony. Tr. p. 52. Petitioner then pushed Kilgore against a railing on the balcony. Kilgore testified that he could then see the street, which was 26 floors below him, and he feared that Petitioner was going to push him over the railing and off the balcony. Id. While

Kilgore was still in Petitioner's grasp, Kallestad approached Petitioner and pushed him away from Kilgore.  Id., p. 54.  Kilgore was then able to escape from Petitioner, and he went back to his apartment.  Kallestad and Petitioner went there too.  Id., p. 55.

Kilgore testified that when he got back to his apartment, his roommate, Palmquist, was trying to call 911.  Tr. p. 55-56.  According to Kilgore, Petitioner followed him into his apartment, took the phone away from Palmquist, and threw the phone on the floor.  Id.  After a brief physical struggle, Kilgore, Kallestad and Palmquist were able to get Petitioner out of the apartment, and call 911 on a different phone.  Id.

The next prosecution witness was Laura Kallestad.  She testified that on the night of October 28, 2000, she and Petitioner were drinking at a bar near her apartment.  After they left the bar, they went to her apartment building and took the elevator to the 26th floor.  Kallestad testified that when the elevator door opened, Petitioner pushed her to the floor, and then tried to drag her to her apartment.  Tr. pp. 172-73.  Petitioner kicked Kallestad, and she began to cry out for help.  Id., p. 173.  She saw Kilgore and some other neighbors enter the hallway.  Id.  When Kilgore asked what was going on, Petitioner charged after him, striking him four or five times, and pushing him back down the hallway.  Id., pp. 174, 178.  Kallestad described Petitioner's demeanor as "ferocious."  Id., p. 179.

Kallestad also described how she saw Petitioner push Kilgore "up against the balcony," and how Petitioner "was choking him and bending him over backwards over the balcony."  Tr. p. 175.  Kallestad then described how she "body-slammed" Petitioner, in order to free Kilgore from Petitioner's grasp.  Id., p. 176.

After Kallestad helped Kilgore get away from Petitioner, she and Kilgore went to Kilgore's apartment. Kallestad testified that Petitioner forced his way into Kilgore's apartment, knocking her, Kilgore and Palmquist to the floor, and that Petitioner grabbed a phone away from Palmquist and threw it away. Tr. p. 177. Shortly thereafter, Petitioner left Kilgore's apartment, and after he was gone, Kallestad also left the apartment. Id.

On cross-examination, the following testimony was elicited from Kallestad: Kallestad testified that she had not reviewed any documents relating the case or a copy of the transcript of the statement she gave to the Minneapolis City Attorney's Office on June 12, 2001. Tr. p. 179. This was the first statement Kallestad had made to police regarding the October 29, 2000 incident. Id., p. 195. Kallestad had spoken with the prosecutor over the phone before giving her statement and had met with him personally; however, she could not recall the exact dates of those discussions. Id., pp. 196-98. Kallestad stated she had had the opportunity to review Kilgore's statement concerning the incident in question. Id., p. 180. Kilgore showed Kallestad copies of a police report from the October 29th incident, the petition for Petitioner's arrest, the restraining order filed by Kilgore against Petitioner, and an affidavit. Id., pp. 183-84.

Kallestad testified that Kilgore had brought a file containing these documents to her apartment and discussed the case with her on multiple occasions prior to the start of the trial. Tr. pp. 185, 187-89. Kilgore also gave Kallestad a copy of the file. Id., p. 193. Kallestad stated that Kilgore knew her location and her phone number leading up to the trial. Id., pp. 188-89. Kallestad spoke with Kilgore the day before the trial began, but denied discussing the trial with him. Id., p. 198. Kilgore expressed his desire that

Kallestad cooperate with the prosecution, but never pressured her to do so. Id., pp. 192-93. Kallestad admitted that she had discussed the case with Palmquist, but denied having reenacted the incident with Kilgore. Id.

Kallestad testified that following the October 29, 2000 incident, she spoke with Petitioner approximately twice a week between November of 2000 and January of 2001. Tr. pp. 186-87. Kallestad told Petitioner that Kilgore was out "to prosecute him," (id., p. 190; see also id., pp. 246, 249), and that Kilgore was pressuring the state's attorney to press charges against Petitioner. Id., p. 190-91.

Kallestad denied threatening Petitioner by telling him that she would have a hit-man kill him or that she would not cooperate in his defense. Tr. p. 217. Kallestad admitted to asking Petitioner for money and that Petitioner had given her money in November of 2000, but denied that she refused to tell police the truth unless Petitioner gave her several thousand dollars. Id., pp. 217-18, 246, 247-49; see also id., p. 224. Kallestad testified she had conversations with Petitioner between November of 2000 and January of 2001 because of a "financial discrepancy" between the two of them, and admitted that she had sued Petitioner in the past and that she intended to sue Petitioner in the future. Id., pp 218-19, 223.

Kallestad was unsure of some of the details surrounding the October 29, 2000 incident. Kallestad testified that she and Petitioner had gone out together to a nearby bar on Saturday, October 28, 2000. Tr. p. 199. She could not recall what time they went to the bar or what she had had to drink there. Id. According to Kallestad, she left the bar voluntarily with Petitioner. Id., p. 202. Petitioner did not assault Kallestad or force her to accompany him to the 26th floor of her apartment building. Id., pp. 202-03.

Kallestad denied having told the investigator in her June 12 statement that Petitioner attacked her for an unknown reason.  Id., pp. 203-05.  Kallestad testified that although she had told the investigator otherwise, she and Petitioner had an argument in the elevator which preceded their physical altercation and that "there was a reason why at the time when [she] was giving [her] statement [that she] didn't include that."  Id., p. 204.  According to Kallestad, after reaching the 26th floor, Petitioner pushed her to the ground and began dragging her in the direction of her apartment.  Id., pp. 204-05.  Kallestad started calling for help because she feared Petitioner was going to "beat [her] up."  Id., p. 204.  Kallestad testified that Petitioner kicked her in the hallway, but that she has no photographs of her injuries.  Id., pp. 210-11.

Kallestad witnessed Petitioner slam Kilgore against the balcony and proceed to choke him.  Tr. pp. 211-12.  Kallestad stated that she ran out to the balcony to help Kilgore and that she "body-slammed" Petitioner in order to break his grip on Kilgore's neck.  Id., pp. 212-13.  Kallestad did not see Petitioner hit Kilgore while on the balcony.  Id., p. 214.  Petitioner then chased Kallestad and Kilgore to Kilgore's apartment.  Id., pp. 214-15.  Kallestad testified that Palmquist was on the telephone near the entryway when she and Kilgore entered Kilgore's apartment.  Id., p. 205.  Kallestad denied having told the investigator that Palmquist, who is disabled, was in a wheelchair at the time.  Id., p. 208.  Kallestad, Kilgore, and Palmquist were in the entryway when Petitioner entered and knocked them to the floor, took the phone from Palmquist and threw it.  Id., pp. 206-08, 215, 216-17.  Petitioner then ran out of the apartment and Kilgore dead-bolted the door.  Id., p. 215.  Kallestad testified that she was scared and went to a

friend's apartment downstairs and was unaware when a successful 911 call was made. Id., pp. 215-16.

According to Kallestad, she was afraid for everyone's safety and afraid of Petitioner so she left her building with Petitioner and stayed in a hotel with him for a few days so that he would not return to the building. Tr. p. 209. Kallestad denied having discouraged a 911 call or telling Kilgore there was a warrant out for her arrest. Id., pp. 209-10, 216. Kallestad admitted she had not mentioned anything regarding Petitioner taking the phone from Palmquist to the investigator while making her statement on June 12. Id., p. 225. Kallestad testified that she did not recall this detail until she realized she would be called to testify and had to think about the incident. Id., p. 225.

Kallestad admitted she has difficulty recounting sequences of events. Tr. p. 225. After being asked about allegations a baby-sitter had made against Kallestad, and about accusations of child sexual abuse Kallestad had made against the baby-sitter, Kallestad denied "ever falsely accus[ing] someone of engaging in a criminal act". Id., p. 242.

Kallestad admitted that she and Petitioner had lived together in a residence Petitioner had paid for and at his parent's home, that she had worked with Petitioner, and that Petitioner sometimes paid her. Tr. p. 243-44. Kallestad denied that she was testifying as a means of retaliating against Petitioner for negative comments his parents had made about her in a letter. Id., p. 245.

Kallestad admitted that a person's consumption of alcohol could affect their perception and ability to later relate events. Tr. p. 250. Kallestad denied on the evening of the incident ever passing out at the bar, entering a dissociative state, or having

impaired perception, memory or ability to later relate events due to her alcohol consumption. Id., p. 251. Kallestad admitted, however, that it has happened to her. Id.

Kallestad testified that in 1988 she was convicted of selling and conspiring to sell controlled substances in Scott and Carver County. Tr. p. 276.

During Kallestad's cross-examination, several lines of questions were limited by the trial court. The court did not allow counsel to ask how many times Kallestad has testified in court in the past or if she is prohibited from consuming alcohol. Tr. pp. 199, 210. The court allowed Kallestad to testify as to the general facts and circumstances surrounding the financial discrepancy between Petitioner and herself; however, the court did not allow testimony regarding the specific details of that controversy. Id., pp. 219-23. The court also did not allow Kallestad to discuss the specific details of the problems between Petitioner and Kallestad prior to the October 29, 2000 incident. Id. The court found that testimony regarding the general facts of Kallestad and Petitioner's personal history was sufficient to show Kallestad's alleged bias. Id., p. 221. The court did not allow impeachment testimony as to Kallestad's ability to recall. Id., pp. 225-232.[3] The court did not allow testimony from other parties regarding Kallestad's psychological condition or her mental health history. Id., pp. 234-239.[4] The court did not allow Kallestad to testify as to whether or not she is disabled. Id., p. 249. The court only allowed Kallestad to testify as to her alcohol consumption immediately preceding

---

[3] Kallestad was not allowed to answer defense counsel's question as to whether she gave a deposition in a case two years prior to Petitioner's trial at which time she testified that she had a memory dysfunction. Tr. pp. 225-32.

[4] The court found there was an insufficient nexus between Kallestad's prior mental problems and her mental state on the night of the incident. Tr. pp. 226-27, 234.

the October 29, 2000 incident; she was not allowed to answer any general questions regarding the effect alcohol has on her. Id., p. 250-51.

Palmquist also appeared at Petitioner's trial. He testified that shortly after midnight on October 29, 2000, he heard a woman screaming in the hallway outside of his apartment. Tr. p. 278. As his roommate, Kilgore, left the apartment to investigate, Kilgore instructed Palmquist to call 911. Palmquist picked up his cordless telephone and went into the hallway. At first, Palmquist was surprised to not see anyone in the hallway, but then he heard "yelling, and a ruckus" on the balcony at the end of the hallway. Id., pp. 282-83. According to Palmquist, he was still in the hallway outside of his apartment, when Petitioner came toward him from the balcony, grabbed the phone out of his hand, and threw it down. Id., p. 283. Palmquist then went back to his apartment. When he got inside, he got knocked down by Kilgore and Kallestad, who were "rushing in" behind him. Id., p. 284. Palmquist then used a different phone to call 911. Id., p. 285.

The only other witness called for the prosecution was Officer Vah, the police officer who responded to the 911 call. He found Kilgore to be "polite," but "a little shaken up." Tr. p. 356. Kilgore showed Vah his injuries, which Vah described as "a minor cut on his lip," and "a small scratch on his left chest." Id., p. 357. Kilgore told Vah that he had heard a man and a woman arguing in the hallway, and when he went out to investigate, the man "ran towards him and punched him on the lip with his right fist." Id., p. 359. Kilgore also told Vah that "he tried to get back into his apartment, but couldn't, and then he ran towards the end of the hallway where the suspect followed and grabbed him on the neck and started choking him." Id.

14

Several witnesses testified for the defense at Petitioner's trial. The first defense witness was an attorney who had previously represented Petitioner in connection with the charges at issue in this case. The attorney said that Kilgore had called him and tried to dissuade him from representing Petitioner, because Petitioner was – in Kilgore's words – "a scum bag." Tr. p. 325.

Another defense witness, who described himself as a friend of Kallestad, testified that he had heard Kilgore make several derogatory comments about Petitioner before the incident that occurred on October 29, 2000. According to this witness, Kilgore had described Petitioner as "nothing but trouble," Kilgore seemed to be "angry" when discussing Petitioner, and Kilgore had told Kallestad that she would be "better off alone than with someone like [Petitioner]." Tr. pp. 329-31.

Several other defense witnesses, including Petitioner's mother and sister-in-law, testified that Kallestad had a very poor reputation for being truthful, and that they would not believe her sworn statements. Tr. pp. 334-35, 339-40, 342, 344, 349. Some of those witnesses stated that Kallestad had threatened to sue Petitioner. Id., p. 335. Petitioner's mother testified that Kallestad was untruthful and "vindictive," that she "had a drinking problem," and that she "tried to get money out of [Petitioner] all [of the] time." Id., pp. 349-50. Another defense witness testified that he once heard Kallestad say that she intended to "concoct some sort of scheme to harm" Petitioner. Id., p. 374.

At the conclusion of Petitioner's trial, the jury found him guilty of two misdemeanors: disorderly conduct, and a fifth degree assault against Kilgore. Petitioner was found not guilty on the remaining charges. The trial court sentenced Petitioner to 90 days in jail, with 75 days to be stayed, if he did not violate the terms of his probation.

The imposition of Petitioner's sentence was stayed until after he completed a direct appeal of his conviction.

Petitioner raised several constitutional grounds for relief in his direct appeal to the Minnesota Court of Appeals. First, he argued that he was prevented "from explaining to the jury why he acted with aggression toward Ronald Kilgore," because the trial court prevented the jury from hearing all about his relationship with Kallestad. In a related argument, Petitioner contended that the trial court violated his constitutional right to confront his accusers, by limiting the scope of his cross-examination of Kallestad. Finally, Petitioner argued that he had been denied a fair trial, because the prosecution had been allowed to present Kallestad's testimony, even though her name had not appeared on the list of intended prosecution witnesses. Appellant's Brief and Appendix, [Docket No. 3]; see also State v. Gherity, No. C8-01-1086 (Minn.App. 2002), 2002 WL 1837912 (unpublished opinion).

The Minnesota Court of Appeals rejected all of Petitioner's arguments on the merits and affirmed his conviction. The court summarized its resolution of Petitioner's direct appeal as follows:

> Because the district court acted within its discretion by permitting Kallestad to testify and limiting cross-examination, and because any restriction on evidence of [Petitioner's] motives for his conduct toward Kallestad was harmless beyond a reasonable doubt, we affirm.

Gherity, 2002 WL 1837912 at *1. Petitioner sought further review in the Minnesota Supreme Court, but that request was denied on October 29, 2002.

On May 13, 2003, Petitioner filed a 37-page post-conviction motion in the trial court, which raised numerous claims for relief. See Petitioner's Exhibit C (post-

conviction motion) [Docket No. 3].  The post-conviction motion was still pending before the trial court when Petitioner filed his current federal habeas corpus petition on January 15, 2004.

## II.    PROCEDURAL HISTORY OF FEDERAL HABEAS CORPUS CASE

The present habeas corpus case has a long and somewhat convoluted procedural history.  Most of that history is explained in the Court's previous Report and Recommendation dated February 20, 2008 [Docket No. 67] ("R&R-II"), and only a condensed version of that history will be provided here.

On January 15, 2004, Petitioner filed the instant Petition for Habeas Corpus under 28 U.S.C. §2254 seeking relief from his conviction and sentence for assault [Docket No. 1].  In this Petition, the following grounds were asserted by Petitioner: (1) errors by the trial judge requiring disclosure of certain information prior to trial violated his Constitutional rights under the Fifth, Sixth and Fourteenth Amendments; (2) denial of his right to confrontation in violation of the Sixth and Fourteenth Amendments; (3) violation of his right to present a complete defense; (4) intentional prosecutorial misconduct; (5) ineffective assistance of counsel; and (6) denial of right to fair trial and due process in subsequent proceedings. [Docket No. 1].

Shortly after Petitioner filed his habeas petition, Respondents filed a response, [Docket No. 12], arguing that the case should be summarily dismissed because Petitioner had failed to exhaust his state court remedies for all of his federal habeas claims.  See 28 U.S.C. § 2254(b).  Respondents pointed out that some of Petitioner's federal habeas claims were raised for the first time in his state post-conviction motion, and those claims had not yet been adjudicated by the state courts, because Petitioner's

post-conviction motion was still pending at that time in the trial court. Respondents contended that Petitioner had not exhausted his state court remedies for some of his federal habeas claims – namely the claims that were still awaiting adjudication in the pending state post-conviction proceedings. This Court agreed with that argument, and therefore recommended that this action should be summarily dismissed without prejudice, due to non-exhaustion. See Report and Recommendation dated July 8, 2004 [Docket No. 17]. The District Court Judge adopted that recommendation, over Petitioner's objection, and ordered that this case be dismissed. See Order dated August 24, 2004 [Docket No. 19].

Petitioner appealed the order dismissing this case, and the Eighth Circuit Court of Appeals upheld that appeal, and remanded the case to the District Court for further proceedings. See Gherity v. Swenson, 173 Fed.Appx. 532 (8th Cir. 2006) (unpublished opinion). The Court of Appeals directed the District Court to consider whether Petitioner's habeas corpus case should be stayed, rather than dismissed, while he awaited a final ruling on his state post-conviction motion. Id. at *1 (citing Rhines v. Weber, 544 U.S. 269 (2005)).

After the appellate court remanded the case, this Court was informed that Petitioner's post-conviction motion had been denied by the trial court on August 29, 2005. That ruling was handed down while Petitioner's habeas case was on appeal, but it appears that the Court of Appeals was not aware of the ruling. See R&R-II, p. 13. The Court was further informed that Petitioner did not appeal the trial court's ruling on his post-conviction motion, and it was now too late to do so. Because Petitioner's state post-conviction proceedings were now completed, the Court found that there was no

further need to consider whether the present habeas corpus action should be stayed. The completion of the state post-conviction proceedings caused the stay issue to become moot. Id., p. 14.

The Court then considered whether Petitioner's current habeas corpus claims could properly be decided on the merits. It was clear that Petitioner had not exhausted his state court remedies for some of his habeas claims, because the claims that were raised in his post-conviction motion were never presented to the Minnesota appellate courts. See O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) ("Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts,... state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.") Furthermore, it was clear that those unexhausted claims had become procedurally defaulted, because the time for Petitioner to seek further review of those claims in the state appellate courts had run. R&R-II, p. 15.

The Court also recognized, however, that Petitioner's procedurally defaulted habeas claims could still be addressed on the merits, if he could satisfy the "cause and prejudice" standard prescribed by the Supreme Court in Coleman v. Thompson, 501 U.S. 722 (1991). R&R-II, p. 15. The Court found that Petitioner had not been able to file a timely appeal in his state post-conviction proceedings, because he had not received a timely notice of the trial court's ruling on his post-conviction motion. Based on that determination, the Court concluded that Petitioner was able to satisfy the "cause" component of the "cause and prejudice" standard. R&R-II, p. 16. The Court

further concluded, however, that it was impossible to determine, based on the then existing record, whether Petitioner could satisfy <u>Coleman's</u> prejudice requirement. (R&R-II, pp. 16-17.) Therefore, Respondents were ordered to produce certain additional state court records, to facilitate the Court's resolution of this case. R&R-II, pp. 25-26.

Respondents submitted additional state court records in response to the Court's last Report and Recommendation, and thus, the matter is now before the Court for further consideration of Petitioner's habeas corpus claims.

After reviewing Respondents' new submissions, and carefully reconsidering the entire record in this case, the Court now finds that it would be most propitious to simply address all of Petitioner's habeas corpus claims on the merits, without analyzing and deciding whether Petitioner could satisfy <u>Coleman</u>'s prejudice requirement with regard to his defaulted claims. "Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." <u>Barrett v. Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir.) (<u>en banc</u>), <u>cert</u>. <u>denied</u>, 528 U.S. 846 (1999). <u>See also</u> 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); <u>Tokar v. Bowersox</u>, 198 F.3d 1039, 1049 (8th Cir. 1999) ("[s]ince we find the issue can be easily resolved on the merits, we need not delve into all of [the petitioner's] excuses for his procedural default"), <u>cert</u>. <u>denied</u>, 531 U.S. 886 (2000); <u>Trussell v. Bowersox</u>, 447 F.3d 588, 590 (8th Cir.) (confirming that procedural default is not a <u>jurisdictional</u> bar to review of a habeas claim, and addressing

petitioner's apparently defaulted claim on the merits "in the interest of judicial economy"), <u>cert</u>. <u>denied</u>, 549 U.S. 1034 (2006).

There are not many reported cases in which the <u>Coleman</u> prejudice standard has been analyzed and applied. Nevertheless, in this particular case, the Court has concluded that deciding the prejudice issue would involve nearly the same analysis as it would use to decide the defaulted claims on the merits. Moreover, and most importantly, based on the Court's review of the current record, it is now evident that Petitioner is not entitled to a writ of habeas corpus on any of the claims presented in his current petition, including his defaulted claims. Consequently, the Court finds that it is preferable to avoid the still unresolved procedural default issues that are presented in this case, and proceed directly to the merits of Petitioner's claims. As our Court of Appeals has aptly observed, "[t]he simplest way to decide a case is often the best." <u>Chambers v. Bowersox</u>, 157 F.3d 560, 564, n. 4 (8th Cir. 1998), <u>cert</u>. <u>denied</u>, 527 U.S. 1029 (1999).

## III. STANDARD OF REVIEW

The standard of review that must be applied to Petitioner's substantive claims for relief was discussed briefly in the last Report and Recommendation. R&R-II, pp. 7-9. However, that discussion warrants reiteration, and some further elaboration, because it is critically important to understand that federal habeas review does <u>not</u> entail de novo of Petitioner's claims.

The standards that govern this Court's substantive review of Petitioner's habeas corpus claims are prescribed by the Antiterrorism and Effective Death Penalty Act, ("AEDPA"). The relevant portion of AEDPA, 28 U.S.C. § 2254(d), provides that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

In <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), the United States Supreme Court discussed the meaning of this statute, and how it should be applied by the federal district courts. The Supreme Court recognized:

> [a] state-court decision can be 'contrary to' this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

<u>Id</u>. at 405.

> Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id</u>. at 413.

The Court also explained:

> "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was <u>objectively unreasonable</u>.... [¶] [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 409, 411 (emphasis added).  The Eighth Circuit has described the review under

§ 2254(d)(1) as follows:

> A decision is 'contrary to' federal law 'if the state court arrives at a
> conclusion opposite to that reached by [the Supreme] Court on a question
> of law' or if it 'confront[ed] facts that are materially indistinguishable from a
> relevant Supreme Court precedent' but arrived at an opposite result...
> [citing Williams, 529 U.S. at 405].  A state court 'unreasonably applies'
> federal law when it 'identifies the correct governing legal rule from [the
> Supreme] Court's cases but unreasonably applies it to the facts of the
> particular state prisoner's case,' or 'unreasonably extends a legal principle
> from our precedent to a new context where it should not apply or
> unreasonably refuses to extend that principle to a new context where it
> should apply... [citing Williams, 529 U.S. at 407]
>
> A federal court may not issue the writ simply because it 'concludes in its
> independent judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly.  Rather, that application
> must also be unreasonable....' [citing Williams, 529 U.S. at 411].

Engesser v. Dooley, 457 F.3d 731, 735-36 (8th Cir. 2006), cert. denied, 549 U.S. 1223

(2007).  Under this standard, the federal court "must deny a writ – even if we disagree

with the state court's decision – so long as that decision is reasonable in view of all the

circumstances."   May v. Iowa, 251 F.3d 713, 716 (8th Cir. 2001) (citing Williams,

529 U.S. at 409-13).

A writ of habeas corpus may also be available where the state courts' resolution

of a prisoner's criminal case is "based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

In other words, habeas relief can be granted if the conviction is based on findings of fact

that could not reasonably be derived from the state court evidentiary record.  When

reviewing a state court decision, however, "a federal court... presumes that the state

court's factual determinations are correct," and that presumption "may be rebutted only

by clear and convincing evidence." <u>Lee v. Gammon</u>, 222 F.3d 441, 442 (8th Cir. 2000).

28 U.S.C. § 2254(e)(1) provides that

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

In this case, Petitioner has not explicitly stated whether he is relying on 28 U.S.C. § 2254(d)(1) or (2). Nevertheless, it is evident from the substance of his Petition and supporting memoranda that he is raising a challenge under § 2254(d)(1). In other words, the facts are not in dispute; rather it is Petitioner's contention that the trial court's rulings on several pretrial issues and evidentiary issues were contrary to, or amounted to an unreasonable application of, federal law established by the Supreme Court's precedents.

In performing a review under § 2254(d)(1), it is important to remember that this section, by its terms, "limits the benchmark precedent against which a habeas court may measure a state court decision to 'clearly established Federal law, <u>as determined by the Supreme Court of the United States</u>.'" <u>O'Brien v. Dubois</u>, 145 F.3d 16, 20 (1st Cir. 1998) (overruled on other grounds) (emphasis added). Thus, even if lower federal court decisions support Petitioner's position, "the writ cannot issue unless the state court decision contravenes, or involves an unreasonable application of, extant Supreme Court jurisprudence." <u>Id</u>.

> If no Supreme Court precedent is dispositive of a petitioner's claim, then, a fortiori, there is no specific rule to which the state court's decision can be 'contrary.' In such circumstances, a federal habeas court then determines whether the state court decision reflects an unreasonable application of clearly established Supreme Court jurisprudence.

Id. at 25. "To the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." Atley v. Ault, 191 F.3d 865, 871 (8th Cir. 1999) (citing O'Brien, supra).

In sum, a federal district court is not allowed to conduct its own de novo review of a habeas petitioner's constitutional claims. Habeas relief cannot be granted unless Petitioner has identified, and substantiated, a specific error committed by the state courts. Moreover, Petitioner must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted by the Supreme Court in Williams. With this in mind, the Court now turns to the six substantive claims for relief that Petitioner has raised in his current habeas corpus petition.

## IV. DISCUSSION

Petitioner has raised six grounds for relief in his habeas corpus petition. Applying the standard of review prescribed by 28 U.S.C. § 2254(d) as discussed above, the Court finds that Petitioner is not entitled to a writ of habeas corpus on any of his six claims.

### A. Compelled Disclosure of Evidence

Petitioner initially claimed that his constitutional rights were violated when the trial court directed his attorney to file a memorandum describing the means, and the legal authority, by which the defense intended to challenge the credibility of one of the prosecution's witnesses, namely Laura Kallestad. According to Petitioner, the required memorandum forced him to testify against himself in violation of the Fifth Amendment

prohibition against self-incrimination, and also violated his constitutional right to due process.[5]  Petitioner further contended that the required memorandum violated the attorney-client privilege and the attorney work product discovery rules.

The Court first notes that Petitioner grossly mischaracterized the nature and scope of the trial court memorandum at issue.  Petitioner claimed that the defense was required to "disclose to the prosecution all evidence it intended to introduce at trial." Petitioner's Memorandum In Support Of Petition [Docket No. 2], p. 26.  Petitioner cited nothing in the record to support this broad proposition.  To the contrary, it is evident that the trial court wanted the defense only to show how it intended to challenge the credibility of a single prosecution witness – namely Kallestad.  Furthermore, it is readily apparent that the trial court did not direct the defense to disclose any incriminating

---

[5]      Before addressing the merits of Petitioner's first habeas corpus claim, the Court observes that the constitutional bases for the claim were not fairly presented to the state courts on Petitioner's direct appeal, even though they were fully known to Petitioner at the time.   In Petitioner's brief to the Minnesota Supreme Court in support of his application for further review, he devoted only two sentences to his "forced disclosure" argument.  See Petitioner's Exhibit B (Petition For Review of Decision of the Court of Appeals) [Docket No. 3], p. 7.)  The argument was supplemented by a quotation from a single state court decision.  The quotation from the state court decision included a vague reference to the Constitution, but on the whole, the forced disclosure argument presented in Petitioner's direct appeal does not look anything like the first ground for relief presented in the instant habeas corpus petition.  Thus, it appears that Petitioner's first habeas claim was not fairly presented to the Minnesota state courts, and that Petitioner has not satisfied the exhaustion of state remedies requirement as to that claim.  See Picard v. Connor, 404 U.S. 270, 276 (1971) (to satisfy the exhaustion of state remedies requirement, a habeas petitioner must have "present[ed] the state courts with the same claim he urges upon the federal courts").  Moreover, it is now much too late for Petitioner to present his current constitutional arguments to the state courts, so his first habeas claim appears to be procedurally barred.  Nevertheless, the Court will consider the claim on the merits, in accordance with the discussion, supra.

evidence, or any strategy that the defense was trying to hide from the prosecution. The trial court required the memorandum at issue only after the defense had already declared that it intended to introduce a host of questionable admissible evidence to attack not only Kallestad's credibility, but her entire character.

Petitioner also argued that the memorandum required by the trial court violated the Fifth Amendment proscription against self-incrimination, because it compelled him to be a witness against himself. This argument, however, finds no support in the record or in the law. The trial court did not require Petitioner to disclose any evidence that tended to incriminate him, nor does it appear that Petitioner voluntarily disclosed any such evidence in the memorandum. Again, Petitioner was only required to (a) clarify his already-disclosed plans for challenging Kallestad's testimony, and (b) identify the legal authority on which those plans were grounded.

Petitioner also submitted that even if he was not required to disclose any evidence that directly incriminated himself, his Fifth Amendment rights still were violated, because "'the prosecution should [not] be free to build up a criminal case, in whole or in part, with the assistance of <u>enforced disclosures</u> by the accused.'" <u>Id</u>., p. 27, quoting <u>Ullmann v. United States</u>, 350 U.S. 422, 427 (1956) (emphasis added by Petitioner). This principle, however, is irrelevant to Petitioner's case, because he has not identified any "enforced disclosures" that helped the prosecution build its case against him "in whole or in part." Petitioner has not shown that the brief at issue afforded any benefit to the prosecution. Indeed, if anything, the brief gave the defense an opportunity to present more complete arguments on the evidentiary disputes pertaining to Kallestad's trial testimony. Primarily, however, the brief merely served its

intended purpose of helping the trial court make a reasoned and informed decision about what evidence could be used, and what evidence could not be used, to challenge Kallestad's testimony.

Petitioner's first habeas claim is further undermined by the decisions of the United States Supreme Court. That Court has looked favorably on pretrial discovery and disclosure requirements, even in criminal cases, pointing out that "[t]he adversary system of trial is... not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." Williams v. Florida, 399 U.S. 78, 82 (1970). In this case, the Court upheld a state law that required criminal defendants to disclose the names of expected alibi witnesses. The Court rejected challenges that were based on both the due process clause, and the self-incrimination clause, and declared that "[n]othing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense...." Id. at 85.

Petitioner's reliance on attorney-client and work-product rules is also unavailing. Federal habeas relief is available under § 2254 only for violations of the federal Constitution. Estelle v. McGuire, 502 U.S. 62, 67 (1991). However, attorney work product rules are discovery rules, which have been established as a matter of public policy, and not because of any constitutional requirements. United States v. Nobles, 422 U.S. 225, 236-237 (1975) ("The work-product doctrine, recognized by this Court of Hickman v. Taylor, 329 U.S. 495... (1947), reflects the strong 'public policy underlying

the orderly prosecution and defense of legal claims'").[6]  Because the work product doctrine is not grounded on the federal Constitution, Petitioner's current work product argument cannot be entertained in the  present federal habeas corpus proceeding.  See Nichols v. Bell, 440 F.Supp.2d 730, 814 (E.D.Tenn. 2006) (claims based on alleged violation of the attorney work-product doctrine are not cognizable in a federal habeas corpus proceeding, "because the privilege for attorney work-product is not a constitutional privilege under the United States Constitution, nor is the privilege applicable to the states under any federal law or treaty"); Sherman v. Yolo County Chief Probation Officer, No. Civ. S-04-1310 LKK KJM P (E.D.Cal. 2007), 2007 WL 2429712 at *10 (same).

Similarly, the attorney-client privilege is an evidentiary rule, which, like the work product doctrine, is not grounded on the federal Constitution.  See Partington v. Gedan, 961 F.2d 852, 863 (9th Cir.) ("[s]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right"), cert. denied, 506 U.S. 999 (1992) (quoting Clutchette v. Rushen, 770 F.2d 1469, 1471 (9th Cir.1985), cert. denied, 475 U.S. 1088 (1986)); Hamilton v. Workman, No. Civ.-04-1392-T, (W.D.Okla. 2006), 2006 WL 1444898 at *3 ("neither the [attorney-client] privilege nor the work product doctrine have been recognized as having a constitutional basis").

A violation of the attorney-client privilege can implicate the Sixth Amendment right to counsel, but only when "the government interferes with the relationship between

---

[6]    The Constitution is never even mentioned in Hickman v. Taylor, 329 U.S. 495 (1947), which is the case in which the work product doctrine originated, and the case upon which Petitioner has relied in support of his first habeas claim.

a criminal defendant and his attorney." <u>Partington</u>, 961 F.2d at 863. "Moreover, before it amounts to a violation of the Sixth Amendment, any government interference with the privilege must substantially prejudice the criminal defendant." <u>Id</u>.

In this case, Petitioner has vaguely suggested that the government interfered with his relationship with his lawyer, but he has not explained how that supposedly occurred. The trial court merely directed Petitioner's counsel to explain why he should be allowed to challenge Kallestad's testimony by the means that he had already indicated he intended to use. Petitioner has not shown how that directive purportedly violated his Sixth Amendment right to consult with his attorney.

Finally, Petitioner has not shown that he suffered any specific and substantial prejudice because of the brief that his attorney was directed to file. He has vaguely suggested that the prosecution gained some tactical advantage from reading the brief at issue, but he has not explained what, specifically, that advantage could have been. It is true that some of the evidence discussed in the brief was held to be inadmissible at trial; but there is no reason to believe that the brief <u>caused</u> that evidence to be excluded, or that the trial court would have admitted the evidence, if not for the brief. As noted above, the brief requirement should have been helpful to the defense, because it provided the defense an opportunity to marshal its evidence, and offer its arguments and authorities for admitting that evidence. This Court does not find that the brief at issue caused any harmful prejudice to Petitioner's defense.

In Petitioner's summation of his first habeas corpus claim, he argued that –

By requiring the defense to disclose all of its evidence and strategies to the prosecution in advance of trial and denying reciprocal discovery it assured a conviction of the defendant. The trial court unconstitutionally

> shifted the burden upon the defendant to prove its theories and strategies and defense were meritorious in advance of trial giving the prosecution an unfair advantage.

Petitioner's Memorandum In Support Of Petition [Docket No. 2], p. 31. This certainly sounds like a terrible abuse of Petitioner's constitutional rights, but it is hyperbole. The trial court did not compel the defense to "disclose all of its evidence and strategies to the prosecution;" the defense was not assigned the burden to "prove" anything; and the memorandum required by the trial court did not "assure[ ]" Petitioner's conviction. Because Petitioner has failed to substantiate the conclusory arguments raised in his first claim for relief, that claim must be rejected.

### B. Restrictions on Cross-Examination

Petitioner next contended that the trial court violated his constitutional rights under the Sixth Amendment, by limiting the scope of his cross-examination of Laura Kallestad. Petitioner did, of course, have an opportunity to cross-examine Kallestad,[7] but it is also true that the trial court restricted the scope of Kallestad's cross-examination.

Generally speaking, the trial court allowed Petitioner to cross-examine Kallestad on all matters that pertained directly to the alleged offense, and to her credibility. Petitioner was permitted to ask questions pertaining to Kallestad's "reputation for truthfulness," (Tr. p. 13), including "specific instances concerning her character for truthfulness," (Tr. p. 14). Petitioner was also permitted to question Kallestad about (a) her "prior relationship with Petitioner and any resulting bad feeling," (Tr. p. 15),

---

[7] The cross-examination of Kallestad covers more than 70 pages of the trial transcript. Tr. pp. 179-251.

(b) various "threats" she purportedly made against Petitioner, (Tr. p. 16), (c) her alleged attempts to extort money from Petitioner, (id.), and (d) her consumption of drugs or alcohol on the night of the alleged offense, (id.).  See also Tr. pp. 179-251.  Petitioner was also allowed to impeach Kallestad by eliciting evidence of some prior criminal convictions.  Id., p. 276.

However, Petitioner was not allowed to ask Kallestad about "the details" of her prior relationship with Petitioner, or about being raped (by someone other than Petitioner).  Tr. p. 15.  Nor was Petitioner allowed to question Kallestad about her "treatment history" for mental health issues, or for drug or alcohol abuse, "without further indication that it affects her truthfulness."  Tr. p. 16.

Petitioner now contends that the trial court restricted his cross-examination of Kallestad in a manner that violated his Sixth Amendment right to confront his accusers.  In rejecting this argument in his direct appeal to the Minnesota Court of Appeals, the court pointed out that even with the restrictions imposed by the trial court, defense counsel still did the following:

> [v]igorously cross-examined Kallestad at trial on her alleged attempt to hire a hit man to kill [Petitioner], her alleged attempts to convince [Petitioner] to pay her in exchange for favorable testimony, her civil lawsuit against [Petitioner], allegations that she had once falsely accused someone of a crime, her consumption of alcohol on the night in question, and her two prior felony convictions for selling and conspiring to sell controlled substances.

Gherity, 2002 WL 1837912 at * 3.  On this record, the appellate court concluded that "[t]he jury had an ample basis on which to judge Kallestad's credibility and her capacity to recall events, and the court properly exercised its discretion by denying further cross-examination."  Id. at *4.

In order to succeed on his present habeas corpus claim, Petitioner must show that the state court's resolution of his Sixth Amendment claim was contrary to, or involved an unreasonable application of, relevant Supreme Court precedent. He has failed to meet that burden.

The starting place for this Court's analysis is the United States Supreme Court's articulation regarding the purpose and bounds of the Sixth Amendment in the context of a cross-examination of a trial witness. The Supreme Court has frequently re-affirmed that one of main purposes of the Sixth Amendment's confrontation clause is to ensure that a criminal defendant has an opportunity to cross-examine prosecution witnesses. Davis v. Alaska, 415 U.S. 308, 315-316 (1974); Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986). At the same time, the Court has stated:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

Van Arsdall, 473 U.S. at 679 (emphasis added).

Even the authorities cited by Petitioner show that the "extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted." Alford v. United States, 282 U.S. 687, 694 (1931) (quoted at Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 33) (emphasis

added).[8]

The trial court restricted the scope of Petitioner's intended cross-examination of Kallestad based on concerns that the trial would "lose its focus and turn into a battle between [Petitioner] and Mr. Kallestad [sic] over a relationship which apparently has gone sour." Tr. pp. 20-21. The trial court explained that this "would be an inappropriate way for this case to proceed." Tr. p. 21. The trial court further explained that "[i]t would also be inappropriate to put Ms. Kallestad's character, other than her character for truthfulness, into issue in this case." Id. In other words, the trial court determined that the scope of cross-examination should be limited, so as to eliminate irrelevant evidence that would cause confusion and prejudice. This was an entirely appropriate, adequate and constitutional rationale for the trial court's restrictions on Kallestad's cross-examination. See Van Arsdall, supra, (citing concerns of "prejudice [and] confusion of the issues" as proper grounds for imposing reasonable limits on cross-examination).

The Eighth Circuit has also recognized that "[a] key factor in determining whether a defendant's right of confrontation has been violated is whether the defendant had other means at his disposal to obtain the effect that the excluded examination would

_____

[8]     The Court has not overlooked the other parts of the Alford opinion that are quoted in Petitioner's memorandum, including the section that reads as follows:

> But no obligation is imposed on the court, such as that suggested below, to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked. There is a duty to protect him from questions which go beyond the bonds of proper cross-examination merely to harass, annoy or humiliate him.... (Citations omitted.) But no such case is presented here.

Alford, 282 U.S. at 694.

have allegedly established." <u>United States v. Warfield</u>, 97 F.3d 1014, 1024 (8th Cir. 1996), <u>cert</u>. <u>denied</u>, 520 U.S. 1110 (1997). In this case, Petitioner retained numerous and substantial means of challenging Kallestad's credibility, notwithstanding the restrictions on cross-examination imposed by the trial court. The record clearly belies Petitioner's contention that "it was not 'further' testimony that was limited but <u>any</u> testimony in relevant areas of inquiry." Petitioner's Memorandum In Support of Petition, [Docket No. 2], p. 37 (emphasis by Petitioner). As the Minnesota Court of Appeals noted, even with the restrictions imposed by the trial court, Petitioner was still able to show that "Kallestad suffered from post-traumatic stress disorder, allegedly hired a hit man to kill [Petitioner], allegedly attempted to extort money from [Petitioner] in exchange for favorable testimony, filed a civil lawsuit against [Petitioner], consumed alcohol on the night of the altercation, falsely accused someone of a crime, and had two prior felony convictions for selling and conspiring to sell controlled substances." <u>Gherity</u>, 2002 WL 1837912 at *4. Petitioner had an ample ability to challenge Kallestad's trial testimony, despite the restrictions on her cross-examination.

The Supreme Court has said that "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985). This observation is directly applicable here. Petitioner obviously was not able to cross-examine Kallestad exactly as he wished,[9] but he was

---

[9] The Court notes, however, that Petitioner's explication of his Sixth Amendment claim, (Petitioner's Memorandum In Support Of Petition, [Docket No. 2], pp. 32-37), does not identify even one specific question that he wanted to pose to Kallestad on cross-examination, which he was barred from asking. As a result, it is impossible to

able to cross-examine her effectively, which is all that the Supreme Court requires. For all of these reasons, the Court concludes that state courts' resolution of Petitioner's Sixth Amendment claim was not contrary to, nor did it involve an unreasonable application of, the decisions of the Supreme Court.

### C. Inability To Present "A Complete Defense"

Petitioner's third habeas corpus claim – that he was unable to present "a complete defense" -- is closely related to the confrontation claim discussed immediately above. Petitioner contended that he was deprived of his constitutional right to present a complete defense, because the trial court's evidentiary rulings precluded him from explaining his conduct at the time of the alleged offense. Although Petitioner was accused of attacking Kilgore, he wanted to focus the jury's attention on his relationship with Kallestad, who was merely a witness to the assault against Kilgore. Petitioner maintained that the trial court violated his constitutional rights by ruling that "[i]t is not relevant in this case whether defendant was actually assaulting Kallestad or what his motives were in doing so." Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 39 (quoting Tr. p. 14).

The trial court ruled that, under the Minnesota Rules of Evidence, Petitioner could not be granted unfettered leave to present any evidence about Kallestad as he saw fit. The defense was not barred from introducing evidence showing that Petitioner was defending himself or Kallestad from an attack by Kilgore. Tr. p. 15. However, the trial court understandably recognized that the jury could easily be distracted from the

directly address the particular cross-examination restrictions – whatever they may be – that gave rise to Petitioner's current habeas corpus claim.

central issue in this case – i.e., whether Petitioner assaulted Kilgore and Palmquist – if Petitioner were allowed to focus the jury's attention on Kallestad's "bad character," and his long and sordid relationship with Kallestad. The trial court explained:

> Because Ms. Kallestad is neither a victim nor a perpetrator in this case, her character is not strictly at issue. If we were concerned with an assault by [Petitioner] against Ms. Kallestad, or vice versa, the analysis would be different. However, that is not the charged offense, and Ms. Kallestad's character has nothing to do with whether or not [Petitioner] assaulted Mr. Kilgore or Mr. Palmquist.... [¶] It is not relevant in this case whether [Petitioner] was actually assaulting Kallestad or what his motives were in doing so.... [¶] As of this time, evidence of the details of the prior relationship of Kallestad and [Petitioner] is not relevant....

Tr. 14-15 (emphasis added).

Based on these observations and rulings by the trial court, Petitioner has asserted that he was deprived of his constitutional right to present a complete defense, because he was not allowed to fully explain his relationship with Kallestad, and fully inform the jury about all of Kallestad's corrupt characteristics and behavior. As described by Petition, the matters that Petitioner wanted to present to the jury include the following:

> [M]y relationship with Ms. Kallestad, my explanation of why I thought it was necessary to forcibly assist Ms. Kallestad into the safety of her own apartment (in light of her psychological condition and intoxication), her history of violent and bizarre behavior towards me and others, the full extent of her extortion attempts where she demanded money from me and my client and held my personal possessions and business records ransom; her history of making false criminal against others [sic] including accusing her ex husband of rape, assaults and domestic abuse to gain sympathy and/or tactical advantage in court proceedings; her impending custody and support proceedings where her mental condition, insobriety and assault of her minor daughter required a guardian ad litem to be appointed with supervised visitation; her prior sworn testimony that I have never assaulted her and that I devoted four five years [sic] of my life to taking care of her and securing the psychological treatment she needed.

Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 39.

"It is well established that the Fourteenth Amendment, along with the Sixth Amendment, guarantee criminal defendants the opportunity to present a complete defense, including the right to present relevant testimony." Boysiewick v. Schriro, 179 F.3d 616, 620 (8th Cir. 1999), cert. denied, 528 U.S. 1141 (2000). "The Constitution does not, however, guarantee that criminal defendants may call every witness they choose." Khaalid v. Bowersox, 259 F.3d 975, 978 (8th Cir. 2001), cert. denied, 535 U.S. 1021 (2002), citing United States v. Scheffer, 523 U.S. 303, 308 (1998). "An accused 'does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence.'" Khaalid, 259 F.3d at 978, quoting Taylor v. Illinois, 484 U.S. 400, 410 (1988).

"A state court's evidentiary ruling is a matter of state law, and [federal courts] may examine the ruling in a habeas proceeding only to determine whether the asserted error denied due process." Bailey v. Lockhart, 46 F.3d 49, 50 (8th Cir. 1995). See also Wood v. Lockhart, 809 F.2d 457, 459 (8th Cir. 1987) ("[q]uestions relating to the admissibility of evidence are matters of state law and are generally not cognizable in an action for habeas corpus"), citing Maggitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.), cert. denied, 429 U.S. 898 (1976). "To establish a due process violation warranting federal habeas relief, [a habeas petitioner] must prove that the [evidentiary] error was 'so gross'... 'conspicuously prejudicial'... or otherwise of such magnitude that it fatally infected the trial and failed to afford [the petitioner] the fundamental fairness which is the essence of due process." Kerr v. Caspari, 956 F.2d 788, 789 (8th Cir. 1992), quoting Rainer v. Department of Corrections, 914 F.2d 1067, 1072 (8th Cir. 1990), cert. denied,

498 U.S. 1099 (1991).  <u>See</u> <u>also</u> <u>Bounds v. Delo</u>, 151 F.3d 1116, 1119 (8th Cir. 1998) (same).

The Eighth Circuit Court of Appeals has observed that "[r]ulings on the admission or exclusion of evidence in state trials rarely rise to the level of a federal constitutional violation."  <u>Nebinger v. Ault</u>, 208 F.3d 695, 697 (8th Cir. 2000).  A habeas petitioner who claims that a state court evidentiary ruling violated his federal constitutional rights faces a very heavy burden of persuasion.  "'To carry that burden, the petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial – <u>i.e.</u>, that absent the alleged impropriety the verdict <u>probably</u> would have been different.'" <u>Gee v. Groose</u>, 110 F.3d 1346, 1350 (8th Cir. 1997) (emphasis added), quoting <u>Anderson v. Goeke</u>, 44 F.3d 675, 679 (8th Cir. 1995).  <u>See</u> <u>also</u> <u>Harris v. Bowersox</u>, 184 F.3d 744, 752 (8th Cir. 1999) (same), <u>cert</u>. <u>denied</u>, 528 U.S. 1097 (2000).

In this case, the Minnesota Court of Appeals correctly recognized Petitioner's constitutional right to present a defense, stating that "[c]riminal defendants have a fundamental due process right to explain to the jury the conduct that gave rise to the alleged criminal activity."  <u>Gherity</u>, 2002 WL 1837912 at *4.  "Because the state courts correctly identified the governing legal rules" pertaining to Petitioner's present habeas claim, it cannot be said that their decision is "contrary to" the applicable Supreme Court precedents for purposes of 28 U.S.C. § 2254(d)(1).  <u>Marcrum v. Luebbers</u>, 509 F.3d 489, 504 (8th Cir. 2007), <u>cert</u>. <u>denied</u>, 129 S.Ct. 754 (2008).  Thus, only the "unreasonable application" clause of that statute is at issue here.  <u>Id</u>.  To establish that the state courts' application of the law was "objectively unreasonable," so as to warrant

habeas corpus relief, Petitioner would have to show that the outcome of his trial probably would have been different if the trial court had allowed him to introduce the evidence at issue. Gee, supra.

On Petitioner's direct appeal, the Minnesota Court of Appeals concluded the evidence he had sought to present to the jury regarding his relationship with Kallestad, and regarding her corrupt character and conduct, "would not influence a reasonable jury in determining whether [Petitioner] was guilty or not guilty of assaulting Kilgore." State v. Gherity, 2002 WL 1837912 at *5. In other words, the State Court found that the jury's verdict probably would not have been different, even if Petitioner had been allowed to present all of the evidence that he wanted to present. This was not an "objectively unreasonable" determination.

As the trial court repeatedly pointed out, Petitioner was not accused of assaulting Kallestad; he was accused of assaulting Kilgore and Palmquist. Perhaps the excluded evidence could have persuaded the jury to exonerate Petitioner if it had tended to show that Petitioner did not actually assault Kilgore or Palmquist, or that Petitioner was legally justified in assaulting them because he was defending himself. However, the Court finds nothing in the record to suggest that the excluded evidence could have accomplished either of those objectives. The excluded evidence would not have caused the jury to disbelieve Kilgore's description of how he was punched and choked by Petitioner. Nor would that evidence have shown that Petitioner had some legal justification for punching and choking Kilgore.[10] It was entirely reasonable for the trial

---

[10] The Minnesota Court of Appeals pointed out that Petitioner was not barred from taking the witness stand, and personally telling the jury what he did, and why he did it.

court to conclude that the excluded evidence would have served no purpose other than to needlessly confuse the jury and divert their attention from assessing Kallestad's ability to be truthful and unbiased.

In sum, the Minnesota Court of Appeals found that Petitioner failed to demonstrate that he was not denied due process by the trial court's evidentiary rulings. <u>Id</u>. That determination was not objectively unreasonable. Upon examination of the record as a whole, the Court cannot conclude that Petitioner's trial probably would have had a different outcome if the evidence he sought to present to the jury had been presented. Therefore, the Petitioner cannot be granted a writ of habeas corpus based on his third claim for relief.

### D. Prosecutorial Misconduct

Petitioner's fourth ground for relief presented several allegations of prosecutorial misconduct. Petitioner has cited four specific instances of alleged prosecutorial misconduct, which purportedly deprived him of his constitutional right to due process and a fair trial: (a) the prosecutor failed to disclose a key prosecution witness, namely Laura Kallestad, until the day before the trial; (b) the prosecutor failed to disclose certain allegedly exculpatory evidence, which Petitioner did not discover until after his trial; (c) the prosecutor intentionally solicited certain testimony from a witness in violation of a court order; and (d) during closing arguments, the prosecutor expressed his personal belief that Petitioner was guilty.

---

<u>Gherity</u>, 2002 WL 1837912 at *5. Of course, Petitioner had a constitutional right to remain silent, but having chosen to exercise that right, he cannot then blame the trial court for not letting the jury hear his side of the story.

Petitioner's first two arguments will be addressed together, because they both involve an alleged failure to disclose information to the defense. The third and fourth arguments will also be jointly addressed, because they both involve allegedly improper attempts to influence the jury.

**(1)    Failure to disclose**

Petitioner initially claimed that the prosecutor violated his constitutional rights by (a) waiting until the eve of trial to disclose that Kallestad would be a witness at his trial, and (b) failing to disclose allegedly exculpatory evidence regarding Kallestad's "contacts with State agencies prior to trial." The allegedly exculpatory evidence purportedly showed that Kallestad contacted the Office for Lawyers Professional Responsibility before Petitioner's trial, presumably to complain about Petitioner's conduct in connection with the offense at issue in this case, and perhaps some other matters.[11] Petitioner contended that Kallestad contacted other "State agencies" as well. Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 42.[12]

The federal Constitution requires prosecutors to disclose exculpatory evidence to defendants. Brady v. Maryland, 373 U.S. 83 (1963). In order to prevail on a Brady claim, a habeas petitioner must first identify some specific evidence that was known to

---

[11]    Petitioner is an attorney. His license to practice law was suspended indefinitely following his conviction in the case that is now before the Court. In re Disciplinary Action Against Gherity, 673 N.W.2d 474 (Minn. 2004).

[12]    Petitioner alleged that the "State agencies" that Kallestad allegedly contacted include "the Minneapolis Police, the Hennepin County Attorney, the Minneapolis City Attorney, and the Office for Lawyers Professional Responsibility." Kallestad allegedly gave these agencies "varied statements concerning [Petitioner] and attempted, unsuccessfully, to initiate additional charges against [Petitioner]." Petitioner's Memorandum In Support Of Petition, [Docket No. 2], p. 42.

the prosecution before his trial, but did not become known to him until after the trial. United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996). The petitioner must also show that there is a "reasonable probability" that the outcome of the trial would have been different, if the exculpatory evidence in question had been disclosed to the defense before or during the trial. Kyles v. Whitley, 514 U.S. 419, 434 (1995), citing United States v. Bagley, 473 U.S. 667, 678 (1985).

In short, in order to succeed on his current Brady claims, Petitioner must show that he was prejudiced by the prosecutor's alleged failure to disclose the matters at issue, and, in addition, that such prejudice was so serious and egregious that it probably changed the outcome of the trial. See Kyles, 514 U.S. at 433 ("evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different'") (quoting Bagley, 473 U.S. at 682).

The state courts found that Petitioner was unable to sustain either of his two failure to disclose claims. The Minnesota Court of Appeals expressly ruled that "the record does not support [Petitioner's] contention that he was prejudiced by the untimely disclosure of Kallestad." State v. Gherity, 2002 WL 1837912 at * 3. The trial court subsequently ruled in Petitioner's post-conviction proceeding, that "[t]he record holds nothing to indicate that such statements [i.e., the statements Kallestad allegedly made to various state agencies] would have affected the outcome of the trial." Order of the State District Court for Hennepin County, Minnesota, dated August 29, 2005, [Docket No. 57, Part 9], at p. 3.

Petitioner has not shown that state courts' resolution of <u>Brady</u> claims was contrary to, or involved an unreasonable application of, Supreme Court precedents. The state courts resolved Petitioner's claims by looking at the materiality and significance of the allegedly undisclosed information, which fully comports with Supreme Court case law.

Petitioner has also failed to show that the state courts resolution of his <u>Brady</u> claims was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Minnesota Court of Appeals found that Petitioner was unable to show that he was prejudiced by the late disclosure that Kallestad would be a witness. The appellate court pointed out that, notwithstanding the late disclosure of Kallestad, "defense counsel was 'very well prepared' for cross examination," and "defense counsel was already more knowledgeable than the state about Kallestad's personal history and relationship with [Petitioner]." <u>Gherity</u>, 2002 WL 1837912 at *3. The court also noted that "[t]he depth of the cross-examination and the number of character witnesses demonstrate that defense counsel was prepared to respond to Kallestad's testimony," and "the record does not support [Petitioner's] contention that he was prejudiced by the untimely disclosure of Kallestad." <u>Id</u>. Based on an independent review of the record, this Court finds no fault in the Court of Appeals' resolution of the prejudice issue. Petitioner has not given this Court any reason to believe that the outcome of his trial would have been different if he had received earlier notice that Kallestad was going to be a witness.

The Court also finds no fault in the trial court's determination that Petitioner failed to show a denial of due process resulting from the alleged failure to disclose Kallestad's

"contacts with State agencies prior to trial."  This Court fully agrees with the trial court's determination that Petitioner "provides no evidence that knowledge of these communications would in any way alter the outcome of the trial."  Order of the State District Court for Hennepin County, Minnesota, dated August 29, 2005, [Docket No. 57, Part 9], at p. 3.  Indeed, Petitioner has not shown how Kallestad's alleged "contacts with State agencies" would have had likely changed the outcome of the trial.  While Petitioner apparently believes that this evidence would have shown that Kallestad harbored some ill will toward him, and that these feelings affected her trial testimony, a review of the trial transcript establishes that the jury was presented with an abundance of evidence to support that very proposition.  There is no reason to think that evidence of Kallestad's so-called "contacts with State agencies," would have materially altered the jury's assessment of Kallestad's testimony.[13]

### (2) Prosecutor's trial conduct

Petitioner also claimed that he was deprived of his constitutional rights because of alleged prosecutorial misconduct during the course of his trial.  He contended that the

---

[13]     The Court notes that Petitioner apparently was able to acquire the information regarding Kallestad's "contacts with State agencies" without any assistance from the prosecution.  If that allegedly undisclosed evidence was available to Petitioner from other sources, then Petitioner's failure-to-disclose argument would likely have been rejected, even if he could satisfy the prejudice requirement.  See Gonzales, 90 F.3d at 1368 ("the government need not disclose evidence available to the defense from other sources..."); see also, United States v. Jones, 160 F.3d 473, 480 (8th Cir. 1998) "There is no Brady violation if the defendant[s], using reasonable diligence, could have obtained the information" themselves.") (quotations and citations omitted); United States v. Willis, 997 F.2d 407, 412-413 (8th Cir. 1993) ("The failure by the prosecution to turn over material contained in a public file does not result in the denial of a fair trial when defense counsel fails to exercise diligence in investigating the file.") citing Lugo v. Munoz, 682 F.2d 7, 10 (1st Cir. 1982).

prosecutor "intentionally elicited suppressed testimony," and "gave his personal opinion as to defendants [sic] guilt in his summation." Petition, [Docket No. 1], p. 5, § 12.D. Neither the habeas petition itself, nor Petitioner's supporting memorandum, described the circumstances giving rise to these last two claims of prosecutorial misconduct.[14] The Court can only assume that Petitioner is referring to (a) a statement that a witness, Darryl Palmquist, made during his testimony, and (b) the final two sentences of the prosecutor's closing statement.

In a recorded statement made before trial, Palmquist said that when he heard Kallestad screaming in the hallway, he said to his roommate, Kilgore, "he's beating her up again." Tr. p. 268. Before Palmquist testified at trial, the defense asked for an <u>in limine</u> ruling that would prohibit Palmquist from repeating that statement to the jury. The trial court granted that request Tr. pp. 268-71. However, during the course of Palmquist's direct examination, the prosecutor asked him what he did after he heard screaming in the hallway, and Palmquist responded "I told Ron that it sounds like he's beating her up." Tr. p. 279. Defense counsel objected to that testimony, and the trial court sustained the objection. Tr. p. 279. Defense counsel then moved for a mistrial, but that request was denied. Tr. p. 280.

---

[14]    In fact, a review of Petitioner's direct appeal and his Petition for Post-Conviction Relief indicates that he never raised these claims of prosecutorial misconduct to the trial court or to the appellate courts. Consequently, these claims fail for non-exhaustion as no state court has had the opportunity to consider them and they are now procedurally defaulted. Nevertheless, as this Court has stated that it will decide the merits of all grounds asserted by Petitioner in his habeas petition, the Court briefly sets forth its analysis of these claims, as well.

Later, during closing arguments, the prosecutor summarized the evidence that he considered to be important, and concluded by telling the jury: "That's what the evidence has shown. Because the evidence has shown that, we ask that you find [Petitioner] guilty, because he is, in fact, guilty." (Tr. p. 398.) The defense did not object to that statement, nor did the defense object to anything else that the prosecutor said during his closing argument.

A prosecutor's misdeeds during the course of a defendant's trial will not be viewed as a violation of the defendant's constitutional rights unless they are "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." Moore v. Wyrick, 760 F.2d 884, 886 (8th Cir. 1985). See also Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998) (prosecutorial misconduct does not merit habeas corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair trial), cert. denied, 525 U.S. 1073 (1999), citing Darden v. Wainwright, 477 U.S. 168, 181 (1986).

"'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.... Rather, the 'relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996), cert. denied, 520 U.S. 1109 (1997), quoting Darden, 477 U.S. at 181. "Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial -- i.e., that absent the alleged impropriety, the verdict probably would have been different.'" Mack, 92 F.3d at 643, (emphasis added), quoting Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991). See also Clemons v. Luebbers,

381 F.3d 744, 757 (8th Cir. 2004) ("[r]elief is available only if 'the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have sua sponte declared a mistrial'"), <u>cert</u>. <u>denied</u>, 546 U.S. 828 (2005), quoting <u>James v. Bowersox</u>, 187 F.3d 866, 869 (8th Cir.1999), <u>cert</u>. <u>denied</u>, 528 U.S. 1143 (2000).

In this case, the Court is not persuaded that the prosecutor did anything wrong. First, it is by no means clear that the prosecutor knowingly and deliberately solicited testimony that was barred by the trial court's <u>ad</u> <u>limine</u> ruling. Second, the prosecutor did not ask the jury to accept his personal belief that Petitioner was guilty; he merely argued that the evidence showed Petitioner was guilty.

However, even if the prosecutor did do something improper, Petitioner has not come close to showing the requisite of a denial of due process. Looking at the record as a whole, this Court cannot conclude that the prosecutor's alleged misconduct was so "egregious" that it "fatally infected" the entire proceedings, and effectively deprived Petitioner of his right to a fair trial. Palmquist's testimony – "it sounds like he's beating her up" – did not disclose any new, inflammatory information to the jury. Both Kilgore and Kallestad had already told the jury that Petitioner was kicking Kallestad as she was lying on the hallway floor outside of Palmquist's apartment. Tr. pp. 50, 173. Given that evidence, this Court finds that Palmquist's errant testimony, by itself, did not affect the outcome of the trial.

Petitioner has also failed to show that the prosecutor's comments during closing argument "fatally infected" the entire trial, and deprived him of a fair trial. Indeed, the prosecutor's remarks were so innocuous that they did not even elicit an objection from

defense counsel at trial, nor did they ever become the subject of Petitioner's direct appeal or petition for post-conviction relief. Thus, the Court concludes that Petitioner's final prosecutorial misconduct claim, like the others, is unsustainable.

### E. Ineffective Assistance of Counsel

The fifth ground for relief listed in Petitioner's habeas corpus petition is identified as an ineffective assistance of counsel claim. Petitioner contended that he was deprived of his Sixth Amendment right to effective assistance of counsel "by the trial courts [sic] failure to grant a continuance to give him [i.e., defense counsel] an opportunity to prepare and subpoena witnesses." Petition, [Docket No. 1], Attachment p. 1, "Ground 5." This obviously is not a traditional ineffective assistance of counsel claim, because Petitioner is not alleging that his attorney failed to provide competent legal representation. See Payne v. United States, 78 F.3d 343, 345 (8th Cir. 1996) ("[t]o prove ineffective assistance, a petitioner must prove both incompetence and prejudice; he must 'establish that counsel's performance fell below professional standards and that ineffective performance prejudiced his defense'") (quoting Thompson v. United States, 61 F.3d 586, 587 (8th Cir.1995)). Petitioner's current ineffective assistance claim is actually a restatement of the state law claim raised by him in his direct appeal – namely, that the trial court abused its discretion by failing to grant the lawyer a continuance.

In Petitioner's direct appeal, he argued that the trial court had abused its discretion by denying his request for a continuance after he was formally notified that Kallestad would be a witness for the prosecution. Petitioner's attorney told the trial court that he needed more time to gather evidence and subpoena witnesses, so that he could effectively cross-examine and impeach Kallestad, and rebut her testimony. The

trial court rejected that argument, and denied the request for a continuance. On Petitioner's direct appeal, he argued that the trial court's refusal to grant a continuance was an abuse of discretion.

Petitioner has now recast his original abuse of discretion claim as a Sixth Amendment denial of counsel claim, presumably to give the appearance that is properly reviewable in a federal habeas corpus proceeding. Although the legitimacy of this tactic is questionable, there is no need to make that determination because Petitioner's claim must be rejected on the merits, regardless of how it is couched.

Whether Petitioner's denial-of-continuance claim is viewed as an abuse of discretion claim brought under state law, or an ineffective assistance of counsel claim brought under the Sixth Amendment, the claim cannot succeed without a showing of prejudice. See Strickland v. Washington, 466 U.S. 668, 692 (1984) ("any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution").

The Minnesota Court of Appeals determined that Petitioner was not prejudiced by the trial court's refusal to grant a continuance. The Court of Appeals explained its decision as follows:

> The decision on whether to grant a continuance is within the district court's discretion.... We will not reverse a conviction for denial of a motion for a continuance, unless the denial constitutes a clear abuse of discretion and the defendant demonstrates prejudice.... When no prejudice results from a late disclosure, a continuance is unnecessary to remediate the prejudice....
>
> The district court reasonably concluded that defense counsel was already more knowledgeable than the state about Kallestad's personal history and relationship with [Petitioner]. Furthermore, defense counsel vigorously cross-examined Kallestad at trial on her alleged attempt to hire a hit man

to kill [Petitioner], her alleged attempts to convince [Petitioner] to pay her in exchange for favorable testimony, her civil lawsuit against [Petitioner], allegations that she had once falsely accused someone of a crime, her consumption of alcohol on the night in question, and her two prior felony convictions for selling and conspiring to sell controlled substances. Defense counsel also called five witnesses to testify that Kallestad had a reputation for untruthfulness. The depth of the cross-examination and the number of character witnesses demonstrate that defense counsel was prepared to respond to Kallestad's testimony. The district court did not abuse its discretion by denying [Petitioner's] requests for a continuance in light of the centrality of the eyewitness testimony and the reason for the late disclosure.

Gherity, 2002 WL 1837912 at *3 (citations omitted).

The state appellate court's determination that Petitioner was not prejudiced by the denial of a continuance forecloses his current ineffective assistance of counsel claim, unless he can show that the court's determination was at odds with apposite Supreme Court precedents, or reflects an unreasonable interpretation of the evidence of record. Petitioner has made no effort to satisfy either of these standards, and the Court finds no reason to believe that he could do so. Because Petitioner has not effectively challenged the Court of Appeals' prejudice determination, in the manner prescribed by 28 U.S.C. § 2254(d), he cannot be granted a writ of habeas corpus on his current ineffective assistance of counsel claim.

### F. Miscellaneous Claims

"Ground 6" of the current habeas petition is just a short list of miscellaneous claims. Petitioner maintained that he "was denied a fair trial and Due Process at Trial and in subsequent proceedings," because (a) "there were excessive delays in the proceedings," (b) "members of the lawyers Board [were] at trial," and the judge and her clerk "made expressions of hostility towards defendants [sic] counsel," (c) there were

"irregularities in sentencing," in that "[t]he Lawyers Board and Mr. Kilgore called the judge to inform her and/or ask why [Petitioner] was not in jail," and (d) Kallestad and Kilgore committed perjury when they testified that Petitioner had hit and choked Kilgore. Petition, [Docket No. 1], Attachment, pp. 1-2. None of these claims were presented to the trial court or state appellate courts on appeal or in the petition for post-conviction relief. Further, Petitioner has not cited anything in the record, or any legal authority for that matter, to support any of these arguments.[15]

To state an actionable claim for habeas corpus relief, a petitioner "must allege sufficient facts to establish a constitutional claim. Mere conclusory allegations will not suffice." Wiggins v. Lockhart, 825 F.2d 1237, 1238 (8th Cir. 1987), cert. denied, 484 U.S. 1074 (1988). Because Ground 6 of the current petition is merely conclusory, Petitioner has failed to state an actionable claim.

---

[15] Petitioner claimed that he failed to develop these arguments because of a Local Rule that prohibits briefs in excess of 45 pages. Petitioner's Memorandum in Support of Petition [Docket No. 2], p. 44. He apparently is referring to a now out-of-date Local Rule, LR 7.1(c), which limited memoranda in support of motions to 35 pages, (not 45 pages), "except by permission of the Court." (The current version of the Rule imposes a word count limit, rather than a page limit.) Petitioner never asked for permission to exceed the prescribed page limit. Furthermore, even though Petitioner was not given permission to exceed the page limit imposed by the former version of LR 7.1, he nevertheless did so on his own. The Court has given due consideration to his entire 45-page memorandum, not to mention his Responsive Memorandum [Docket No. 12] which is 12 pages in length. The Court is satisfied that Petitioner should have been able to summarize all of his legal arguments in 57 pages. Even in complicated death penalty cases, litigants are seldom, (if ever), given unfettered opportunities to present their cases; they must always hone their arguments so they do not impose unnecessary burdens on the judicial system. See United States v. Battle, 163 F.3d 1, 1 (11th Cir. 1998) ("[e]ven in a death-penalty case, the court expects counsel to be highly selective about the issues to be argued on appeal and about the number of words used to press those issues"). In short, the Court rejects any suggestion that Petitioner was not given a fair opportunity to present all of his arguments in support of his current habeas petition.

Additionally, there are several obvious flaws in Petitioner's arguments. First, Petitioner has made no effort to explain why any of the unidentified "excessive delays" mentioned in his petition might cast any doubt on the validity of his conviction. Petitioner's claims might not have been addressed as quickly as he might have desired, but he has offered no reason to think that any alleged delays prevented him from receiving either a fair trial, or a fair review of his conviction in his post-trial motions, his direct appeal, his post-conviction motion, or his current habeas case.

Second, Petitioner has not cited anything in the record to support his contention that he was "denied an impartial tribunal." This argument is based on nothing more than speculation and self-serving accusations.

Third, Petitioner's "irregularities in sentencing" argument appears to be moot, because he apparently has served his entire sentence, including all periods of probation or supervised release.[16] Petitioner might realize some benefit from having his <u>conviction</u> set aside, because the fact of his conviction may still have some collateral consequences aside from the sentence he received. However, nothing meaningful could be accomplished by setting aside Petitioner's sentence, due to the alleged "irregularities in sentencing," or otherwise, because the sentence has been fully served, and it cannot be "unserved" now. Because the Court cannot presently provide Petitioner any meaningful relief from his sentence, any challenge to his sentence has become moot. <u>See</u> <u>Spencer v. Kemna</u>, 523 U.S. 1, 7 (1998).

---

[16] Respondent represented that Petitioner's term of probation ended on February 4, 2004, less than a month after he filed his current habeas petition. Respondent's Response to Petitioner's Motion [etc], [Docket No. 56], p. 2, n. 1.

Finally, Petitioner claimed that his conviction should be vacated because it is predicated on perjured testimony – namely, the testimony of Kilgore and Kallestad. This claim is unsubstantiated and unsustainable. Kilgore and Kallestad both testified that Petitioner hit and choked Kilgore in the hallway outside of his apartment. Petitioner has contended that he did not have an adequate opportunity to challenge that testimony, but every court that has considered that issue – the trial court, the Minnesota Court of Appeals, and now this Court – has rejected that argument. Petitioner was represented by a competent lawyer, who was given an ample opportunity to cast doubt on the veracity of Kilgore's and Kallestad's testimony. Nevertheless, the jury obviously concluded otherwise. Petitioner has failed to establish that he is entitled to a writ of habeas corpus that would nullify the jury's decision.

## V. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Petitioner's application for habeas corpus relief under 28 U.S.C. § 2254, (Docket No. 1), be DENIED; and

2.      This action be DISMISSED WITH PREJUDICE.

Dated:          June 17, 2009

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by July 6, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the

basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.